Case number 23-1290 et al. City of Billings et al Petitioners v. Transportation Security Administration and David P. Bukowski, Administrator. Ms. Allison for the Petitioners, Mr. Overbold for the Respondents. Good morning, Council. Ms. Allison, please proceed when you're ready. Thank you, and good morning. I want to make two points clear from the outset. First, this case is not about whether aviation worker screening is important. It's about who should be doing it. And second, this case is not about a so-called shared responsibility for aviation worker screening between TSA and airport operators. It's about whether TSA can shift that responsibility for screening entirely to airports. To quote the TSA in its record, the National Amendment places the responsibility to screen aviation workers at the airports on the airport operator. That's at Appendix 592. TSA will not provide training nor will it prescribe how a search must be accomplished. That's at Appendix 741. And TSA's cost estimates show that airport operators will bear literally 99.9% of the cost of implementing and conducting the screening. Well, I thought your argument was even stronger in the sense of saying that TSA had the statutory responsibility to do this screening. Not that it should, but that it was required by statute. That's right. That's right, Judge Rogers. They have statutory authority, and the way they carried it out in this case, even if they were permitted to shift this to airports, our alternative argument is the way that they've carried it out here does not meet the standards for agency review. Not just that they have the statutory authority, because I think everybody agreed that they could do it if they wanted to. Instead, the way you read the statute is that only TSA can do it. Only TSA can do it. They do not have the statutory authority to shift it to airport operators. That is our position. So, I mean, we can have a kind of semantic debate about whether it's actually a shift, because that depends on what the baseline is beforehand, whether anybody was doing this physical screening, at least beforehand. But just putting that to one side for a second, you don't disagree that under the security directives that existed at the time the National Amendment was promulgated, under those security directives, airport operators had some responsibility vis-a-vis the access of airport workers to secured areas? Under those security directives, airport operators had no responsibility for physical screening, and that is the dramatic shift. I'm not talking about physical screening. I'm just talking about responsibility to do something vis-a-vis the access of airport workers to secured areas. That's right, Your Honor. Airport operators had to check ID, right? They had to be sure that there weren't obvious prohibited items being visibly carried into secured areas. When you say obvious, how do you say obvious? I thought it meant— Visual, visually. It was all visual inspections, right? Yeah, that's right. So, you know, they could, for example, try to limit the number of access points at the airport to constrain the areas that people were coming in. So they had rules like that. Based on your reading of the statutes, did those functions that were imposed, obligations imposed upon airport operators, were those annulled by the statutes so that now the airport operators no longer have to do those? No, Your Honor. No. What ATSA did was, of course, create a federal, not only a federal security force, but a federal screening force. And with respect to screening, ATSA made it clear in the legislative history, you know, even if you acknowledge that the language of ATSA was ambiguous and TSA has interpreted it two different ways in past cases, it's clear in the legislative history that the screening force was federal. So that didn't change obligations that the airport operator would have to control sort of its perimeter to be sure that people have proper IDs. The ID checks, they don't qualify as screening. No. So even under the old security directives, those were actually referred to as inspections, inspections for ID media, right? Under the national amendment, the TSA refers to screening and it defines it as it has to be a search of the outer garments and the body and belongings. And when there were questions about this in the comments, and you'll see this in the TSA's disposition of the comments, there were many questions about whether this new screening was something different than the visual inspections. And TSA repeatedly said, yeah, yeah, no visual inspections are not adequate. You have to do the physical screening as required under the national amendment. That was a sea change from what airport operators were doing. The way you understand the statute to work is that your view is that after 2016 and 2018, we should read those statutes to make clear Congress's intent that what you're referring to as screening, which apparently is physical screening, that that part of it has to be conducted by TSA officers and only TSA officers. Something that falls short of physical screening, which is how you construe screening can still be done by, and the imposition can be imposed upon airport operators. So, that is right. What airport operators were doing before with respect to visual inspections, they can do. And I would say with respect to the 2016 and 2018 acts, those acts specifically refer to physical inspection. The language in those acts is in 2016, TSA must expand the use of transportation security officers and inspectors to conduct physical inspections. There's no doubt that they cover physical inspections. I don't think anybody's disputing that. I think the question is, are you right in saying that the physical inspections that are called for by the national amendments, that the statutes require TSA and only TSA to conduct those kinds of, actually, we shouldn't call them inspections, I guess. We should call them just to avoid- Searches. Searches. TSA and only TSA can conduct those searches. Physical searches, that's right. And I want to start, I don't want to lose the point from AFSA, right? Starting with AFSA, even if the language of AFSA codified at 44901A and 44903 is ambiguous, the legislative history is not. And it resolves any ambiguity about TSA's exclusive role for screening obligations. We've cited at length in our brief, and I'm not going to repeat it all here, but the theme, the common theme, is the federalization of airport screening. Sponsors of the bill spoke directly about screening passengers, baggage, and employees by federal law enforcement personnel. What do you make of 1933A's reference to shared cost and feasibility to airports, airlines, and the TSA? That's in the 2018- Implementing enhanced employee inspection measures. So what, so this is a 2018 act, which you're referring to the TSA Modernization Act. So first, there was, again, clear language in that act that TSA had to ensure TSA-led random physical inspections. The provision that you're referring to is a separate provision which says, and well, when TSA studies how to enhance these TSA-led random physical inspections, it should perform feasibility studies about all aspects of, you know, aviation worker safety and the insider threat by looking at costs that both, that airports, airlines, and TSA would bear, and the effectiveness of that plan. And that is the cost-benefit analysis that TSA has not undertaken. One of the arguments we make in our claim that this action, you know, even if TSA could shift the obligation that it's arbitrary, is that TSA actually did not follow that directive. Aside from that, I'm not sure exactly what that has to do with the statutory authorization question. Is your, am I understanding your answer correctly in that what you're saying is the shared costs that are referred to in subsection A, those cover a broader array of functions than the physical screening? Of course. Do you think that physical screening, this same statute, makes clear that TSA and only TSA can be responsible for physical screening? That's right. The, that could cover all of the, you know, all of the efforts that we talked about at the beginning. You know, limiting access points, you know, putting up extra, other examples would be putting up more CCTV cameras, having, you know, making sure that they enhance their badging requirements, are all kinds of things. Why don't, why is it clear that for the TSA-led part of it, which I completely understand why you focus on that, that that's not a reference to ATLAS? So, because ATLAS was, at the time of 2018, had been in place for a couple of years, there was a predecessor to ATLAS as well, but the, what was happening under ATLAS, and TSA acknowledges this on page 50 to 51 of its brief, ATLAS was doing, you know, random ID checks, and even more isolated physical searches. I mean, TSA says in its brief at page 50, that the status quo under ATLAS for the national amendment was that workers were not being searched, were not being physical searched. That's what needed to change. And so, Congress is saying, you know, what TSA is doing in 2018 under the ATLAS program is not achieving these, the enhanced employee physical inspections that Congress instructed TSA to do. So, TSA needs to lead those inspections. And the 2018 act, you know, incorporates the 2016 act, which talked about, you know, TSA conducting the inspections with their own employees. The 2018 act says, you know, in accordance with the security act, TSA needs to enhance this capability. So, the 2016 and the 2018 act, your honor, I think clearly support the position that, I mean, I think they have to be read to support that TSA has to conduct the screening and lead the screening. And even if, I just want to make a point that even if this were kind of shared in any way that there were, that where TSA has said, it's not doing any of this enhanced screening, it's shifting it all to airports, 99.9% of the cost to airports, that cannot be square with the language of the 2016 and 2018 act, which certainly suggests at the very least that TSA has to be leading, administering, supervising, you know, this effort. At the very least, it suggests that, and that's not what's happening under the national amendment. So, I, with that, I'll move to the arbitrary and capricious argument briefly, that there are three major concerns that airport operators have raised that I just want to hit. First is, and this is the overarching concern about the entire national amendment, is that Congress, again, created TSA to ensure that federal screening was happening, right? And the airport said in the comments, why are we in a better position to do this than you, TSA? You were created to do this. You've been doing it for over 20 years. You're staffed, equipped. No response. Nowhere in the record is there any discussion of why local airport operators, or even worse, in some cases, low bid public contractors will be doing this work. There's no discussion of that. The second issue airport commentators raised is about the potential liability associated with the physical screening. Again, no response. TSA, well, very dismissive, I would say. They say that, oh, entities will be immune. But, I mean, that's not right. Whether an entity is immune will depend upon state law and whether it even qualifies for governmental immunity. And it's not a hypothetical issue because we saw what happened with the Massachusetts Port Authority after 9-11, right? That they were not immune from suit. They litigated that case for 10 years. They only got out of the case because, at the time, airports had no responsibility whatsoever for screening. That's not an argument that airports were going to have after the national amendment. So, these liability concerns are serious and not hypothetical. Sometimes when we try to figure out whether an agency action was reasonably explained, the problem is we really don't know why they did what they did. They haven't told us in clear terms why they made the choice that they did. Here, it actually does seem pretty clear. This is expensive and they didn't want to pay for it. They might not have the statutory authority to make that choice, but assuming we're in a world where they do have the statutory authority to pass this responsibility on to you, it seems like a quite reasonable decision. Respectfully, Judge Walker, I don't think it would be reasonable for TSA's analysis to start and end with, we don't have the money, which is what it does. First, they actually don't even analyze. We see nowhere in the record whether they could reallocate resources like the 2016 Act told them to do, whether they could somehow fund some portion of this through TSA resources. There's no discussion of any of that. Even if those budgetary concerns were supported, the case law does not allow TSA to not even consider important aspects of the problem. The most recent in the Supreme Court's last term, we got the Ohio v. EPA case where the court made very clear that if you don't consider an important aspect of the problem, you don't meet the standard for agency rulemaking. Here, I've just mentioned two major things that the airport... Let's assume that the cost of this over five years is $300 million, which I think is the figure that is in the record. Do you doubt that the benefits of this screening are higher than $300 million? Well, we can never know that because there's been no cost-benefit analysis. That's precisely why Congress, both the House Appropriations Committee and the Senate Appropriations Committee urged TSA to withdraw this amendment and do the cost-benefit analysis. We have no idea if this is going to be effective, efficient. We have nothing on that, nothing in the record. I have some commandeering questions, but I don't want to cut off this topic. On the commandeering issue, I think this rule covers 165 airports, if I remember correctly. Does that sound right? That's right. Of those airports, they're all owned by state and local governments? Yes, all owned and operated by state and local governments. There are these things called exclusive area agreements, which I take to be a little wing of the airport that is operated by an airline. Right. Effectively, a sublease of the airport's property. Right. This rule covers that. Is that correct? Because it covers the airport, secured areas of the airport, to the extent that the airport has chosen to, with TSA approval, allow an air carrier to operate an area like that, then the air carrier would be responsible for operating that area. Why shouldn't we think of this rule as both on its face, applying to private and public entities, and in practice, applying to private and public entities? Well, I've got a couple of responses to that. First, we have no idea about the number of what these exclusive area agreements are. We see no reference to them in any of the cost analysis or TSA's analysis. I think it might be a problem for you, because in Burkine, the court was unpersuaded that the commandeering was of state entities, because though it could have covered some private entities, it wasn't clear in Burkine whether the amount of private entities was minuscule, in which case it might have been a commandeering, or whether the amount of private entities that it was going to affect was significant. Well, I mean, I think here, based on the record, we could reach the conclusion that the vast majority of this is going to apply to the airports themselves, because there's no reference whatsoever to any particular exclusive area agreement. The vast majority could be 70-30, or it could be 99.99 versus 0.01. I hope I'm not right number zeros there. Right. How do we know which it is? Well, I mean, that's information within the knowledge of TSA across the board, and we don't have that. But I will say that even if what's sort of different here than Burkine is that we've got a situation where, I mean, it's not like the airport operator still owns and operates the airport. As I said, this is effectively like a saying, you can take over these particular obligations, assuming that it's approved. But it's not like that private party doesn't have any... It doesn't independently, outside of the fact that they're at an airport, apply to them. Say the private party didn't do it, whose responsibility would that be? Would it be the airport's responsibility? Well, under these agreements, my understanding is that the private party does have an obligation, but ultimately, like anytime you own and operate a facility, if they don't do their job, I'm pretty sure the owner of the operator is going to end up on the hook too, right? That's helpful. Let's now imagine that there are none of these private agreement things, and it's just all state-owned airports. I think in other countries, it's not always... The airports are not always owned by the government. I think that there are some privately owned airports, maybe many privately owned airports, big airports. So I'm trying to figure out whether I should think of running an airport as the kind of thing that is an exercise of a state sovereign power, like what was happening in Prince or whether... The fact that it is run by the government doesn't necessarily mean that it has to be run by the government. Well, and I think... I mean, I would start with the court decision in Garcia, which says the analysis doesn't really depend any longer on whether it's happening in a proprietary capacity or in a governmental capacity, right? But this idea that... So airports in the United States play a critical national function, right? And so, I mean, yeah, the airports do some things in their proprietary capacity, but the role that they play in the United States, and this might be different in other countries, is intertwined with the national interest. So is it impossible for a private entity to run an airport? In the United States? Yeah. There is a... So none of these... I don't have this at my fingertips. I think there might be one or two in small airports, in the entirety of the United States. There was a program that FAA began many years ago and has altered over time to encourage private involvement and to try to give some exceptions. I have the same kind of questions that Judge Walker asked. But no one does that. No one does it. I think, if I could just finish the question, is there something inherently about running an airport that makes it, as a matter of U.S. law and practice, a government function? And maybe... I think... I don't doubt the proposition that, as a practical matter, certainly all large airports and all even medium-sized airports, maybe, are run by some kind of local government, state government authority. But is there something inherent about running an airport? Because it wasn't apparent to me that there's something inherent about running an airport that makes it governmental in nature. I think, as a practical matter, that is the way airports have been run in the United States. And there are, all over the country... You know why? There are authorities that... You know why there are no private airports? I'm genuinely curious. Why? Why? Why are there no private airports? There are an enormous number of federal obligations that apply when you run an airport, including what you can do with the revenues when you're running an airport. It's very restrictive, not so restrictive in other countries. And I think that discourages... This is my... So that seems practical. I guess my question is this. Suppose I'm running a really... an unbelievably successful company, and I see that there's an opening for a hub in some major metropolitan area that has one airport, let's say, and it's really not functioning so well. And so I just say, I run Acme Corporation. And I say, you know what? I'm going to open the Acme Airport because I see a business opportunity here. It's going to be the best airport anywhere imaginable. Is there something in law that tells me that I can't do that as Acme Corporation? Or is there... It may be practically really difficult commercially to make it succeed. I get that, but... There's nothing in law that says you, a private entity, may not do it. There's a lot of law that applies to doing it that entirely discourages private entities from doing it, which is why the pilot programs have not gone anywhere. But it isn't the pilot programs. Those are government-initiated pilot programs? It's an FAA program to try to encourage private involvement, but it's never occurred. And that pilot program has been around, I want to say, for over 15 years. So as a practical matter, because of the burdens and obligations that come with running an airport, with spending the money that you make, with issues like that, private entities have not chosen to get involved in that operation. And so as a practical effect, you've got all over the country, authorities being set up by the states to run airports, municipal statutes being passed so that the municipality, somebody, will run the airport. I guess what I'm struggling with is the federal government cannot tell a state legislature how to run the legislature. And the federal government cannot tell a local sheriff's department how to run a sheriff's department. I think the federal government can tell an airport how to do that. And the fact that they happen to be public, I'm not sure that it changes the kind of big instinct I have, at least, that the federal government can tell an airport how to run an airport. So respectfully, I think saying that they don't have to be public does sort of minimize all of the reasons why they practically do have to be public. And on the Prince point, this case, this situation, I think is much closer to Prince than to Nebraska versus EPA and South Carolina and the South Carolina versus Baker and those cases. Because what we've got here is you're telling the local and state governments that they have to regulate third-party conduct. They're performing searches of private parties. And that aligns with Prince where the local sheriffs were told to run the background checks. Whereas in the other cases that TSA refers to, it's all about the government's own conduct participating in a regulated activity. Because they were local sheriffs. I mean, I guess the question is, suppose the requirements that are in the National Amendment apply to all airports. And you said that there's at least a couple of maybe small private airports. I probably should, this is my recollection. Sure. I'm not going to say. It's not in the record, but yes. And I'm not going to hold you to that. It just proves the proposition that it's at least possible for there to be a private airport. Let's just assume for arguments purposes, there's a couple. Let's just say there's a couple of smaller ones. And let's just say the National Amendment applies to all airports. I know they didn't apply to all airports and in part because of some of the concerns that were raised. So it was in response to some concerns that were raised about scale of operations. But let's just suppose the requirements of the National Amendment apply to all airports and some of those, a small number of private airports. And let's just suppose also the federal government has a program in effect, as you helpfully said that they do, to encourage private airports. And what the federal government says is, look, we have this program where we want all airports, whether private or publicly owned, to do this on the premises. Yes, there's only a small number now. We hope there's more of private ones. But the bottom line is we want it to apply across the board. That seems different from Prince or other commandeering cases, because even if it's practically true that the lion's share of airports are public, a small number are private, and the federal government actually wants there to be more private. And it doesn't care whether it's private or public. It just wants these security functions to happen across the board. Well, the reason our position is that it's closer to Prince is because this is not a situation, as you see in the cases, where it's just this even-handed application. Because again, as a practical matter, I mean, I acknowledge there's not a law on the books that says private entities can't do this. But as a practical matter, based on the laws that are on the books, they're not doing it, which means the effect is to shift all of this cost. So suppose you had a situation in which it's 50-50, and then for whatever reason, and the mandate is imposed at the time that it's 50-50, there's 50% private and 50% public. And then for whatever reason, the private ones all shut down, and the mandate continues, because then the publicly-owned ones bring a claim at that point and say, look, this used to be even-handed. It's not even-handed anymore. As a practical matter right now, all that's left is government. So that's a commandeering problem. I think under Prince, yes, because Prince focuses intensely on the cost that gets shifted to the state and local governments, which is what's happening here practically, and the blame that will be shifted. And reliability concerns are at the core of these concerns. I have just one fact question related to this. The people who will be screened, at least some of them are not employees of the airport. Is that my right about this? Oh, many, many, many are not employees of the airport, because this is any aviation workers that work at the airport and would have access for some... On the one hand, I feel a lot like Prince, because you've got a sheriff basically screening a citizen who's not part of the organization of the sheriff's department. This is not just requiring a company to screen its own people. But on the other hand, I think there's some contractual relationship. Maybe it's a bank shot, but between the person who's going to be screened and the airport, the person who's going to be screened may have a contract with someone who has a contract with the airport. So there's some kind of privity, not necessarily legal, literal privity, but there's some version of privity going on with who's doing the screening and who's being screened. Even given that relationship, though, the National Amendment regulates the conduct of those aviation workers much differently than what was happening before. The idea that they, like anyone else at an airport, might be subject to a physical search by PSA was one thing, but now they're saying regardless, even if you're not an employee of the airport and you have some, as you say, some tangential relationship because you work at the airport, now that local airport operator or one of their local contractors can subject you to a routine search. I mean, that was entirely different than what was happening before the National Amendment. And so that, I think, does put this closer to the Prince situation. Can I ask you one last question? Sort of getting back to the statutory argument. So suppose 2016 and 2018 laws never happened. They're not on the books. So all we're looking at is the statutory charters for TSA that are in place under the pre-existing statutes. Would you still be making the same argument that if TSA were to come up with the National Amendment and impose the obligation to screen airport workers on airports, that the statutes would forbid that? Absolutely, Judge Srinivasan. And we, as we've argued, even if you acknowledge that the statutory language is ambiguous, well then you don't have to defer to TSA's interpretation and you go to the legislative history and there is nothing ambiguous about the legislative history. The legislative history of what? Of ATSA, the Aviation, Transportation, and Security Act. And it's cited at length. That's what, that's the act that created the TSA. At that point, you'd be relying on the legislative history, but in terms of the text of the pre-existing laws. Oh, we think the text supports our position, but we, TSA itself has given the text two different interpretations. I mean, I'd have to acknowledge that the text is ambiguous. We think it supports our position and we've outlined why, and it refers to screening of all property going into the secured area. That should include aviation workers' property, and that's the same argument that TSA has made in a previous case, or the same interpretation that TSA has offered in a previous case. But even if, even if you find that the language is ambiguous on this specific question as to whether aviation workers are caught within that ambit, you go to the legislative history and what you see over and over again is TSA was created to create a federal screening process, federalized screening. You said three times that if it's ambiguous, you go to the legislative history. I would think if it's ambiguous, you might ask if it's a major question and you might then inquire into whether a $300 million regulation over five years, I'm guessing $600 million in position over 10 years, is a major question. And if it's a major question, it would require more clarity from Congress than the ambiguity that you're describing. That would be accurate, Judge Walker, particularly under more recent Supreme Court precedent that raises a good question on the this is a rare situation maybe in which the legislative history is enormously robust. There were dozens of sponsors for this bill and many of them spoke to the fact that it is, they're creating TSA to be the federal screening force so that every bag, every person, including workers, workers are called out in the legislative history, will be screened by that federal screening force. Let me just be clear on the record. If you win on your statutory argument, there's no need for the court to get to your 10th Amendment argument? That's true, Judge Rogers. All right, just to be clear. And I just could, I finish with the point that what, and this is what the commentators raised about this amendment, is that when you look at that legislative history, what the national amendment is requiring here, diffusing this responsibility to all local operators, including in many cases, contractors under local procurement laws, is exactly what Congress said after 9-11 that would never happen again. And that's why the legislative history is so important here. All right, we need a little bit of rebuttal time. Thank you. We'll hear from the government now. Mr. Overbold. Good morning. May it please the court. I'm sorry to let him have the government. I guess I'd like to start with statutory arguments and maybe first just look to the text of the amendment. It says that TSA shall provide for the screening of all passengers and property, there's an ellipsis, but then that will be carried aboard a passenger aircraft. That just by its terms does not cover aviation workers. So I, you know, I understand to be making, not really disputing TSA's overall authorities to issue a screening requirement like this, absent some sort of statutory prohibition against it, and the text does not support their reading whatsoever. What about the property part of that? Well, it's property that will be carried onto an airplane. That naturally might include the baggage that the traveling public has. I think the statute also notes mail, for example, that you expect is going to be carried on a plane. It's not anything that might go into an airport. Would it cover if an airport worker were to give something to a passenger after they get past a security checkpoint? Would it cover that? I'm not sure. And at the time that you're thinking, is there a screening obligation that property will be carried onto an airplane? Because there's some possibility that through some avenue it may. The other thing I would note is there's another screening, another provision in 44903 H4A that also references screening of all individuals entering the security area of an airport. That does not have the same requirement that the screening be performed by a federal government employee that 44901A has, and that just underscores that Congress was not imposing the broader requirement of all screening that my friend is trying to read into. Wait, can you make that point again? This is H4A? H4A. That talks about requiring screening or inspection of all individuals before entry into a security area of an airport. That does not carry with it. I see, because that one doesn't specifically say it has to be TSA. Yes. So that one says that the TSA has to assure that it happens. That has no- The TSA has to actually do it. That's right, your honor. There's no similar requirement to be performed by a federal government or a contractor under specified circumstances. The other point I'd just like to get to on this statutory argument is just the baseline against which TSA was operating here, and that's a baseline in two senses. First, as I understand my friends to acknowledge, TSA recognized aviation workers were not subject to a reasonable expectation of screening at the time it issued the national amendment. That's in part why one of the bases for the national amendment that there was a need to create this expectation that was not present given the status quo. It also determined it was appropriate for airport operators to have that responsibility given a long history of shared responsibility in the area of airport security and addressing insider threats more generally. That is a history that goes back to the 70s. You have regulations imposing access control responsibilities on airports. Since 2001, there are requirements that they have a security program that includes establishing a security area, taking steps to prevent unauthorized items going into the security area or having unidentified persons enter the area. Since 2006, we talked about the security directive a little bit in the first part of the argument. There are specific requirements to inspect media and inspect whether unauthorized items are being brought into the area. As I understand the other side's argument on that, it's that yes, those existed and yes, they continue to exist, but there's a continental divide between those things which we can call inspection and what we'll call screening, which is physical screening. I was going to say physical inspection, but I want to be careful to make sure that the continental divide is honored, that physical screening of airport workers. As to those, you can tell from the 2016 and 2018 laws that those have to be conducted by TSA. I don't think the 2016 statute helps them at all in indicating there's some sort of distinction between screening and inspection. I mean, it actually directs TSA to expand the use of transportation security officers to perform physical inspection. It doesn't say if there's some sort of term of art screening versus inspection. It doesn't call physical inspection, but the idea is that if you're talking about actually physically engaging with the person you're trying to inspect, that has to be done by, as the 2016 law says, a TSA representative. Well, sorry, it directs TSA to expand the use of transportation security officers to perform those physical inspections, and TSA did respond to that through the ATLAS program that conducts randomized screening. It's not able to get to the level that TSA determines is required in the national amendment. Is the kind of screening that's done under ATLAS by TSA representatives, is that the kind of screening that would suffice under the national amendment for it conducted by airport operators? It's just different a little bit in that it's randomized. It does not design... I mean, the actual inspection itself. Yes. I mean, it is physical screening. In the same way that some airports, at least, were complying with the earlier security directives through physical screening, we don't dispute that not every airport was doing that. In part, it is both to require every airport to do physical screening, and even for those airports that were previously doing physical screening to increase the rate at which they were doing that, that's what the national amendment does. But I think it does go to show that there was no sort of difference in kind and responsibilities between inspecting media and trying to determine if an employee is carrying unauthorized items into a secured area before the national amendment and what the national amendment is requiring now. It's building on existing responsibilities, and I think that goes in part to why TSA determined it was appropriate to have airport operators perform these responsibilities once it determined there's a need for that screening. The people who this rule requires to conduct physical screenings, are those people TSA representatives? I'm sorry, when the airport operators are conducting screening under the national amendment? The national amendment says there needs to be screening, physical screening, right? Yes. And it requires the airports to provide people to conduct those screenings, correct? Yes. Are those people TSA representatives? I don't think so. I guess in the sense they don't have any, they wouldn't have any employment or contractual relationship with TSA. I mean, they're performing a requirement imposed by TSA, but in the same sense that when you're complying with the security directives, you know, I don't think the airport employees who are, or contractors who are doing those sort of duties, I don't think you would necessarily be a TSA representative as a result. Can I share how I'm thinking through and tell me where I'm going awry? I think it would be pretty close case, maybe tip towards your favor, if all we had was what Congress did in the immediate wake of 9-11. They did seem to make pretty clear that they want airport security to be run by the federal government, by TSA, but they did issue some pretty broad statutory provisions that give TSA some flexibility to impose some regulations. So, you know, in that world, close case. But then we have the 2016 amendment, the 2016 statute, and it says the TSA administrator or the administrator needs to subject airport workers to random physical security inspections conducted by TSA representatives. And so then, to me, this goes from kind of a close case where there's not text directly on point to a case where there is express text directly on point saying these, and this is section 3407A3, these inspections need to be conducted by TSA representatives. Well, that seems like really uphill climb for you now. And then we can layer onto that, that if there's still some ambiguity, you may run into a major questions problem. You may run into a constitutional avoidance problem on the commandeering issue. Constitutional avoidance is a good thing. You may run into a legislative history problem. Legislative history is a good thing. But, you know, after all that, it's just a lot, a lot of text going against you and a lot of statutory interpretation tools, some, I think, stronger than others, going against you. There's a lot in that question, Your Honor. I guess it just, I mean, to start with the text, I don't read anything in the 2016 statute to say TSA representatives have to conduct all aviation workers screening. I mean, there's a direction to expand the use of TSOs to perform that screening. And the expanded use that we're talking about, that has to be performed by the security officers. There's no dispute about that. But that is what TSA responded to with the Atlas program. And in 2018, Congress didn't indicate... Before you go to 2018, 2016, expanded use is one provision. That's in 3407B. But Judge Walker referred to 3407A3, the reference to conducted by TSA representatives. And what's your answer to that? Because I think you don't think that the conduct of physical inspections by airport workers are conducted by TSA representatives, which would potentially be an argument. You can say, well, they are still conducted by TSA representatives. It's just not TSA employees, but they're still TSA representatives. But for understandable reasons, you don't make that argument. So what is your argument with respect to that provision? Your Honor, just that that is not talking about the sort of all inspections of aviation workers have to be conducted by TSA representatives. I think that's talking about the specific sort of randomized program that TSA did deploy in response to this statute. So Atlas is the answer to that? Yes. In other words, you think that that was complied with by Atlas because all this says is that TSA has to do something where it's conducting physical security inspections, its representatives conducting physical security inspections, and that's enough to comply with 3407A. And 3407A-3 doesn't say that there can't be beyond that, TSA can impose obligations on airport operators to do that. Yes. I mean, that's right. And I mean, just to get to the 2018 point, Congress didn't say, oh, you've totally misunderstood. We wanted you to be doing all aviation worker screening in 2018. It said, for the screening that you're doing in response to our direction in 2016, make sure it's compliant with this statute and subject to these requirements. I didn't even understand my friends to be arguing there was some broader requirement in A-3 beyond the directive in C that TSA responded to with the Atlas program. So I guess I would like to be clear on TSA's position then on this, that where you have the program, but, or not but, or and, TSA has determined that more is required for purposes of security. Then the question is, one way of looking at what Congress is suggesting is, well, if you do expand it and you still determine that that's not enough for airport security, then I guess you have two options. Your option, the one you chose, is to say, well, we'll have the airport operators do it. Another is to go back to Congress and say, we need to double our staff. Did TSA ever do that? Or did the Department of Transportation or the administration ever ask for funding? For the additional physical inspection that the Atlas program was not covering? I'm not aware of TSA making a request for additional funding. They did respond in 2018, Congress issued this direction to conduct a study of the shared costs of performing additional screening. TSA did respond by submitting a report to Congress in response to that. And in 2020, I mean, it proposed this amendment that has airport operators perform that function. I don't think it has to in sort of making that decision. There's no case they point to that they have to first have considered what is the additional funding we might get from Congress. I think they reasonably considered, do we have the resources in the Atlas program, given the various other functions it serves, and the fact that when you're deploying someone to the Atlas program, they're not at the screening checkpoint, that there is a limitation of resources in that regard. Well, I wasn't getting into the real decision in that respect. I was simply asking whether or not the language of Congress could have been clearer, perhaps, by saying whatever screening, physical screening is required, shall be done by TSA and not the airport operators. You don't have that kind of language. But I guess what I'm troubled by is I do understand the notion that, look, these are airport operators, they're operating the airports, they ought to be responsible for their own employees, wherever they are. All right? So, if the federal government determines national security is potentially going to be adversely affected, then the airports have to do something. And the federal government will do something too, but it's not going to do everything. And it's not going to do everything with regard to the airport employees. And I gather there's been a somewhat mixed response. Some airports are going ahead and doing it, and others are in court saying you don't have authority to do this. And Congress is aware of this dispute. And it's aware that TSA thinks this additional physical inspection is necessary. And yet, it's also concerned about the cost being shifted, at least committee reports suggest it's concerned about the shifting of costs to airport operators. And I'm just concerned, I mean, are we in a situation where Congress imposes duties on federal agencies and then doesn't appropriate the funds that are necessary? But here, the record seems to be that TSA has never taken the position it wants to be the only screener. And your argument is there's nothing in the statutes that requires that, as I understand it. That's right. I mean, I guess I just, I would answer by saying the status quo in terms of the statutes is that there is this requirement that federal government employees screen passengers and property that will be carried onto an airplane. There's not a sort of broader requirement that they'd be responsible for screening aviation workers. TSA has broad authority to regulate civil aviation security, and they've determined this requirement is appropriate. Obviously, if Congress acts and the President signs a statute that either changes the terms of the screening requirements that federal government employees have to be responsible for or otherwise withdraws authority from TSA, that would certainly change the situation. But we don't have that here. So I think where the statutes do not impose the screening requirement on TSA, and it otherwise has broad authority to regulate in this area, this national amendment falls well within statutory authority. Can I ask a question about the statutes, whether the statutes impose the obligation on TSA? You mentioned this in your briefs, but I don't specifically recall it coming up yet at argument. On 2016, so 3407, we talked about 3407A, but we also talked about 3407B. I don't know that we've talked about 3407C. So 3407C is entitled screening. And then it says in C1, the administrator shall conduct a review of airports that have implemented additional airport worker screening, additional airport worker screening, or perimeter security to improve airport security. And then in C sub 2, the administrator is supposed to take that information and come up with recommendations for best practices. Does the fact that C1 refers to airports implementing additional airport worker screening, does that indicate that Congress understood that airports were doing that? It's possible the TSA workers were actually carrying that out in partnership with airports as a practical matter. But as a legal matter, that wasn't being carried out by TSA workers. It was being carried out by airports. And the fact that Congress specifically said, hey, look at that, figure out what's going on there, and figure out what the best practices are, which obviously is forward-looking. You don't come up with best practices unless you're thinking about implementing those practices in the future. Does that help support the proposition that in 2016, Congress didn't mean to say that screening from here on out has to be conducted by TSA workers? Yes. I mean, I think that's exactly right. We do think that that provision underscores that Congress is aware that airports were also had responsibilities for worker screening. In response to that, I think in part in response to that statute, TSA submitted information circulars as well that sort of fleshed out some of the obligations. And when it says, when it talks about additional airport worker screening, is that screening of the variety that was then later imposed by the national amendment? Or is it not that kind of screening? It's some other kind of screening that we might call inspections or something less than that, just kind of a quick physical view without any kind of search. My understanding is that Congress was not drawing in any of these statutes of distinction between quick physical search inspection, quick visual inspection versus some other type of screening. If you use a screening and inspection seemingly relatively interchangeably. So when it's talking about the additional worker screening, I would think it's talking about the sort of physical screening that at least some airports, even before the national amendment, were undisputedly doing. I mean, this is reflected in the response to Massport's decision for reconsideration, for example, before the national amendment, no dispute, it was doing physical screening of airports. Airport operators were doing it. Airport operators, yes, of aviation workers. I think my friend takes the position that they were doing that voluntarily, but just as a matter of what was happening on the ground that Congress might've been referencing there, there was physical screening by airport operators. Do you think the reference in C-1, 3407 C-1 to additional airport worker screening that was conducted by airports, that would at least encompass that kind of screening that was going on? I mean, it may not be only referring to that. Yes. Yes. No, I think that does reflect that Congress was aware that there were, and it was suggesting at least best practices should be circulated to potentially increase that kind of screening on the part of airport operators. I have a question beyond the statutory part, but I want to stop the statutory part of it. No, I'm good on that. Can I ask a question about notice and comment? It's just to shift something that we haven't talked about yet. So on the notice and comment question, I know that the principal focus of your argument has been on this regulation that you say this amendment fits within, and that regulation, I agree, says that here's the kind of comment that we're talking about. It's 30 or 60 days. It's some period that's not quite up to what normal notice and comment would be under the APA. But your argument, I think, is that, look, there's regulation that says that we can do this without doing that, without doing the APA. I guess my question is, how can a regulation do that? So who cares if a regulation says, you know, we're not going to do notice and comment in X circumstances, and then, therefore, that means that the APA doesn't have to be complied with? I guess I don't quite follow the logic of that, and if I could carry out this extra-long question, even a little bit more long with your patients. If part of your argument, and I understood the agency's response to the petition for reconsideration to fold this in, too, is that, look, that regulation was adopted pursuant to notice and comment. And once we have a regulation that was adopted pursuant to notice and comment, everybody knows what's coming. Well, it can't be that an agency can say, hey, I'm giving you notice and comment, that from here on out, we're not going to do notice and comment. That can't be right, either. And so I'm just wondering, what is the work of this regulation actually doing? So I have a first principles kind of response to what I think the regulation might be doing, and then a second response on why it might be. This is a very long-standing regulation. But just, so I went back to when this regulation was issued in 1978. The agency doesn't really explain that then-FAA what it was doing. I think one way you might think about it is that the entity subject to the requirement undisputedly has actual notice and an opportunity to comment. We're talking about airport security programs being changed. The airports, no dispute, all the airport operators got notice. They had the opportunity to comment. And so, I mean, that is a specific sort of provision in 5 U.S.C. 553, where a rule is not imposing requirements on sort of the public at large. Actual notice to the party subject to requirements, an opportunity to comment, that might be sufficient. I think that's my, you know. Could the individuals who will be screened have an opportunity to comment? The aviation workers, I'm not sure, I guess, to what degree representatives of the aviation workers might also have been made aware of the comment. Certainly, there's no indication here that any aviation worker, you know, wanted to comment and was deprived of it. I mean, just as kind of like a harmless error. I don't know. Analysis, yes, but I mean, there's no suggestion, you know, that that is the sort of person who wanted to know. That the people being searched have an interest in the rules about them being searched? I mean, they may have an interest, but, you know, this court in Epic said it wasn't enough just that the change in airport security program might have some effect on the traveling public who are subject to new screening procedures. There, I mean, the change, this court indicated, I mean, imposed a real different direct requirement on the traveling public, given the nature of the screening technology at issue in that case. So, it certainly didn't suggest just the fact that you may then be subject. And the answer to this question may be yes, which would be good for you if it's yes. But was that program as expensive as this program? More expensive? I am not sure what the sort of relative expense is. I think the flying public might also have an interest in commenting on a rule that's going to impose $600 million of costs on the industry over 10 years, because those costs will be passed on to the people who buy airline tickets. Wow. That, again, sounds like if it is an very indirect interest, that is not at all what Epic suggested was sufficient. And that would also, again, probably apply. I mean, I guess different things cost different amounts, but I'm not aware of any suggestions that you get notice and comment for an agency action of certain impact and not above. The second point on the notice and comment question I just wanted to make, this is a regulation issued originally by FAA in 1978. And in the ATSA with TSA being created, I mean, it specifically directed the FAA regulations to continue in effect until TSA takes some action to withdraw them. So again, without any suggestion that it wanted to take some other approach with the amending of airport security programs. I think that, again, makes sense because at the very least, the security programs themselves tend to involve sensitive security information. I don't think I'm still not, and I'm probably just missing something basic. I don't think I'm still understanding the architecture of the argument because, put aside the second point, because I think the second point is like Congress basically put it's imprimatur on this regulation by saying it wants the regulations to continue in force. I don't think we know that it was talking about this particular regulation, right? That's right. Let's just say it was talking about the massive regulations of which this is one, and maybe you could expect Congress to look at every single one, but let's just put that to one side for a minute. I think the first point is the upshot of your position that what this regulation shows is that the agency thought that the relevant parties would have enough of an ability to make their agency aware of their concerns if they fit within the fold of this regulation. Therefore, this regulation shows that this set of issues is just not the kind of set of issues that's subject to the APA's notice and comment regime. This is something different. It doesn't fit within the kinds of rules that are subject to that. If that's true, then I still don't understand what the regulations do because this measure either does or doesn't constitute the kind of measure that's subject to notice and comment. The fact that there's a regulation that says it doesn't, I mean, it shows that the agency might have thought about that. I mean, your brief could make that point too, but the ultimate upshot of it would be that this is not the type of regulation. I still don't understand how the existence of the regulation itself takes something outside of the purview of notice and comment. I'm not sure if the existence of the regulation is what does it. The regulation makes clear that if you're going to amend an airport security program or a group of airport security programs, as in this case, you have to provide notice to the airports and an opportunity to comment. My point just on the APA is just 5 U.S.C. 553 says that's sufficient actual notice to the party subject to the requirements. It's sufficient. And this court's decision in EPIC didn't take issue with that generally, except to the extent that- So then, oh, so it was your argument that the regulation shows that notice and comment actually was done? Yes. Or at least that the actual notice to the airport, which I believe the response also noted, yes, the actual notice to the airport operator is an opportunity for them to comment. So the APA's notice and comment requirements were complied with, not that they don't apply to this measure. It's that they actually were complied with in this situation, and the regulation shows that they were complied with? That's my understanding of how the regulation sort of fits with the requirements of 5 U.S.C. 553. It is a longstanding regulation that that explanation is not reflected when it was initially issued in 78, but just when you do have actual notice to the airports who are the ones actually responsible for the security programs, that fits within the sort of plain text of 5 U.S.C. 553. And suppose we look at it and don't think that the APA's notice and comment requirements were complied with here, and that the regulation doesn't measure up to what the APA would expect to be done in notice and comment, then do you have anything else on notice and comment? I mean, this maybe should have been my first point, but I don't understand this argument to be at all what the petitioners are pressing here. They don't take issue with the sort of general validity of the regulation under the APA. I think they're arguing that in light of this court's decision in EPIC, this falls within the situation in which the procedures of this regulation are insufficient. And I don't think that argument works, just given the very particular features of the screening technology that this court highlighted in EPIC. I mean, I think in that case, it was a direct effect on the traveling public at large, not just the airport operators, who there, too, had notice. I'm not sure they had an operator, but notice in that case. So I guess that would be my – I don't understand this argument to be one that they're pressing, the sort of first principles APA argument. Can – I read your reason for doing this, having the airports do the screening, instead of you, that it's expensive and TSA doesn't have the money to do it, absent, you know, taking money from other programs, TSA programs that are important. Is that the gist of it? I guess I would put it slightly differently. I think TSA looked at whether it could do this sort of screening under its resource constraints and concluded it could not without sacrificing other objectives. I think the other thing I would add is it just also recognized this builds on existing responsibilities that airport operators have long held. You know, we can fight about what the specific requirements at various stages were, but it is true that since the 70s, airport operators have had responsibility for controlling access to particular areas of the airport. Since 2001, that's included establishing a security area and taking steps to prevent unauthorized entry. Since 2006, we have inspection requirements. Again, not every airport was complying with that by doing physical screening, some were, but that's also part of TSA's reasoning, that this builds on existing responsibilities in an area where there long has been a shared responsibility for ensuring airport security. I suspect you think that you believe this is not a major question. Do you want to say why you think it's not a major question? Sure. I mean, I would start to – I don't think it's a major question. I think often in the major questions cases, it's something that an agency is doing that's kind of outside its normal wheelhouse. This is well within TSA's wheelhouse of imposing civil aviation requirements. The notion that just because it's for the major airports, it's $1.3 million average compliance cost per year. That makes it something that falls outside of TSA's civil aviation security. I don't think that's supported by – I thought it was $300 million over five years. Isn't that right? I believe that may be the total. I mean, I think that breaks – TSA broke that down to it's about $1.3 million for the airports in the biggest category by employment, $400,000 or so for the second category. I think most of the cost comes either from opportunity costs or from payroll. If it's $300 million over five years, it would be $600 million over 10 years, right? It's not like the cost will go down after those five years. At least there's nothing in the record to suggest that. Yeah. I'm just candidly not sure of the answer. I mean, I think to some degree, it's like purchase of screening technology, but I do not know the breakdown between sort of fixed and variable cost. I thought – okay. I thought about $300 million may not include purchase of equipment that was under a different line item, but I could be wrong. That could be. Don't quote me. Let's assume just for the sake of this question that I think this is a major question. What's your argument for whether the statute has the clarity that a major question would require? I mean, I guess I would just maybe start with – Or do you think it does have the clarity that a major question would require? I think that, one, there is sort of a recognized broad authority that the statute's conferred, recognized in Bonacci for civil aviation security. The statute talks about specifically requiring screening of individuals entering security areas of an airport. That's 44903-4A. So I think – There's nothing that speaks specifically to this rule. Well, this is a rule requiring screening of individuals entering the security area of an airport. I mean, I don't see how cost estimate of how much that screening requires to take that outside the statute. And especially just given, you know, recognize that Congress granted broad authority, this court has recognized TSA gets a deference on sort of determinations about what is or is not necessary for civil aviation security. I have one last question. It's not about major questions. It's going back to the exclusive area agreements. The Fisher's brief says that those are a minuscule fraction of when compared to state-run, state and local government-run and operated airports. Do you agree with that? I do not have the number. I don't think it's a negligible number of exclusive area agreements that are out there. It's undisputed that certain carriers do have those sort of relationships to terminals, and then they would be responsible for these functions. As far as I'm aware, I don't think the agency has sort of specifically calculated the number of areas like that that would be subject to this requirement. I'm happy to answer any other questions, but talk a little bit about commandeering. On commandeering, just to pick up on where we left off, because that was the latest commandeering. So is there any legal problem with private entities running an airport? I take it the government position in the brief doesn't think so. And then, as a practical matter, it looks like all airports of at least a reasonable size are conducted by governmental authorities of some nature. Why is that? I mean, this is not in the record, and I don't want to put too much weight on it. My among the three category subjects, the San Juan airport that is now privately operated. It's somewhat recently privatized. There may be practical sort of reasons why municipalities do this. I don't know, but there's certainly no legal requirements that it be a municipal or state entity that do this. I don't know. So it could just be the history of sort of operation in the United States versus other countries, but I candidly do not know the answer. The point, I guess, on commandeering I just want to make is that my friends recognize this is a very heavily regulated area of operating airports. And I mean, the implication of their position would be that at least as it relates to things you have to do vis-a-vis your workers or other workers that might enter the areas for which you're responsible, the federal government can impose affirmative requirements. And I just really don't see how that could be right. I mean, there's an unchallenged requirement in this case that for workers that are going to have unescorted access to the security area of an airport, the airport conducts a background check on those workers. If that's a commandeering under Prince, I mean, Prince was also about that. There's also the security directives that require airport operators to do non-official inspections. Yes, that would also be common. I don't see how that's not covered by their theory as well. A number of undisputed... What if there was a federal law that required sheriff's offices to conduct physical screenings of sheriff's office employees who come into the office? Would that be commandeering? I think, I mean, you might have to ask what's, I guess, the congressional power to regulate the operation of sheriff's offices in a way that I think there's undisputedly federal power. I think my friends on the other side would agree there's extensive federal authority to regulate the operation of airports. I'm not sure. In that case, you would have the same situation. I think if the state was operating critical infrastructure, for example, it could also be subject to particular requirements that it might not be subject to the sheriff's offices more broadly. Do you think if there was, you know, interstate commerce clause power or something that wasn't a grant of Congress to do this, it wouldn't run into a commandeering problem for Congress to say to a sheriff's office, you have to conduct physical searches of all sheriff's office employees? There may, I mean, there should be a question about whether Rexine talks about a core sovereign function that might be implicated in a case like that, that is not implicated here. I don't know if it goes back somewhat to whether the airports are public or private. In here, they're all public. And as I was saying with your friend, it's perfectly conceivable that an airport could be private and outside of the U.S. they sometimes are. But, you know, I'm somewhat intrigued by her point that the reason that they're all public is that the federal government has made it impossible for a private airport to be profitable. And so it may be that we should think of them in the U.S. as state entities, you know, kind of covered by commandeering doctrine, because the federal government has basically made the states run them. Well, as I understand the argument, I guess it would be that the number of requirements that an operator has to comply with in order to operate the airport, maybe only state and municipal entities as a matter of practice can do that. I don't think that's true. I mean, there is a federal effort to encourage privatization, there's no legal requirement that it be a state and municipal entity. But again, I just don't think that argument works that the amount of regulation you have to comply with in this necessarily heavily regulated area means that as a state, you can then just opt out of the federal regulation if you're choosing to operate an airport. You can't opt out of lawful federal regulations, but a federal regulation that presses a state official into a federal law enforcement function is not a lawful regulation. Well, I just would disagree that this is pressing them into a federal law enforcement. They're not being asked to sort of enforce the law against the traveling public, private citizens, it's aviation workers, workers who have privileged access to the areas of an airport that the operator controls. So I just think that makes it a very different case from Prince. And it doesn't matter that these people are being searched or not the airport's employees. I don't think so. I mean, and as the sort of the earlier reflect, I mean, already, they're subject to the airport operator deciding these access points are available for particular workers or not. There's some indications of the record, some workers might have access to the security area, some might have access, a sterile area ID, which requires them to go through TSA checkpoints. Aviation workers are subject to a number of requirements, again, as part of this industry that is a number of safety regulations for good reasons. I know it's not in the record, and I appreciate you're saying that, but your understanding is that there is a private airport that's subject to the national. That's my understanding. The San Juan International Airport was privately operated. I know that it's not in the record. Okay. I have one other question. So on major questions, because I hadn't thought about this argument. The major question then would be whether in a situation in which there's already a requirement that airport operators conduct some inspections, visual inspections of airport workers, and there's already a requirement that TSA do screening of everybody other than airport workers who gets to the secured areas, because the main, I take it, the overwhelming number of people who come through are passengers. And if we just did a breakdown of numbers of people, it's going to be passengers who go through, probably going to vastly exceed the volume of... So then the major question would be the physical screening beyond visual inspections of airport workers. Whether that's the major question would be whether that is something that had to be spoken with with the requisite level of clarity that the major questions doctrine implicates. Is that how you would understand it? I see what's up. Yes. I do not understand my credence. And it's costly because it's hundreds of millions of dollars. Yes. That's on its feet. That is on the... Yes, they did calculate... Those are not our figures. Yeah, I would just under... I don't understand my credence of sort of particularly any theory on this. I appreciate that they didn't raise major questions. But if you think of it as a tools statutory interpretation, which a recent precedent of this court said, it's tools statutory interpretation. We treat it almost like expressing a loony as canon. Then it really doesn't matter whether they raised it. I guess I would just say the fact that in sort of making arguments about why this TSA actually exceeds the statutory authorities, it didn't occur to the regulated entities to say, this is the type of question that we're sure Congress would have... It might suggest that it's not a major question. It might suggest that there's a merit to the argument that it's a major question. And I'm not saying it is a major question. Yeah. But I think you would not say the party waives an expressio unis, right? I think you can waive specific statutory arguments and an argument that something outside the agency's broad authority over civil aviation security. I'm not sure that's the sort of argument that cannot be forfeited. You can't waive the obligation to look to the text first, but that doesn't seem like... Sure. I would just make the point that it at least highlights that, absent this sort of dispute about what 44901 requires, I don't think there's any suggestion this is not the sort of thing that's within TSA civil aviation security responsibilities. Thank you, counsel. Ms. Dawson, it will be three minutes for rebuttal. Thank you. So first, I want to be crystal clear that before the National Amendment, airports were not required to do physical screening, period. The voluntary instances that my friend discussed were not the airports trying to comply with the security directive, which we talked about only required visual inspections. It was complying with informational circulars that TSA proposed, which recommend that airports can voluntarily assist TSA. When TSA is administering and supervising screening, they can voluntarily assist. Some did that. It's reflected in the petitions, but it was not required. Your Honor, there was a reference to Section 3407C1 in the 2018 Act. That's what it's referring to, understanding that some airports were doing that. And there were a couple of airports you saw on the record that had some local smuggling concerns, and they decided voluntarily to take over some aspect of the measures and see what they're doing. Again, that's the cost-benefit analysis that didn't happen. I also encourage you to look at the comments in the record. You can find them at 598 and 618 to 619, which really shows how the airport operators are trying to get their arms around what this continental shift, as you said, is going to require. And it just underscores the difference in what was happening. The limited ATLAS operations that my friend referred to do not meet the congressional directives in 2016 and 2018. Again, those sections that Judge Srinivasan referenced call out what the TSA needs to study in order to get 100% worker screening or something that approximates it. It needs to be this continuous, random, risk-based, thorough screening. None of that was happening. The only way that's happening now is under the National Amendment, and it's all the airport operators that have to do it, not TSA-led, not TSA-conducted. And finally, a brief point on the APA. I didn't have a chance to talk about that. The TSA regulation, we have never conceded that the TSA regulation trumps the APA. The APA applies here because, again, this is a substantive change, a continental shift, but to what was happening before. And therefore, not only airport operators, but airport workers and the general public should have had an opportunity to comment. The airport workers have a privacy interest here, but the general public, let's not understate the interest of the public. The general public's interest in knowing about what TSA is doing to carry out its screening obligations, or not doing in this case, is significant, especially considering that TSA was created after a catastrophe that had massive impacts on the general public. That is something the general public should be commenting on. I think we have one small question. On your very last point, it seems like the public might actually have an interest in not knowing too much about how security works at an airport, because the more the public knows, the more the terrorists know. Well, we know that that's not the case, actually, because you can look at the administrative record in this case, and almost none of it is SSI. There's very little marked as SSI. All of the information about what National Amendment is going to require, what airports are doing, what they were doing before now, it's not marked as SSI. Assuming that people might want to be informed about how the federal government is carrying out its activities and how TSA that was created to do this thing is choosing not to do it, I think the public has an opportunity to comment on that. Well, Congress hasn't always agreed with you on that regard, where national security is involved. Again, here, I think there's quite a bit in the record that TSA acknowledges is not- I know, but there may not be the type of information that could be useful in terms of disclosure. I'm thinking in a lot of other disclosure statutes, law enforcement, procedures, et cetera. You just view that actual notice to the regulated entity is necessarily not in compliance with the APA. Right. It's not in compliance here because of the nature of the change. It's a substantive change to the obligations of the airport operator. Even though, and I just need to be clear about, even though cases where the APA applies, actual notice suffices. Well, with respect to the airport operators, I would respectfully, I would disagree that where there's a substantive change to a regulated entity's obligations, that the APA allows a agency to circumvent that via regulation. I think there's a second point is that there are other interests, and this is another point that you evaluate under the APA, that there are other interests, particularly public interests that are in play, and so the public should have the opportunity to comment. That, again, answering your first question, Judge Rogers, is there's not a lot the public needs to know here to comment. They need to know that all of the individuals- But I'm saying the law under the APA is that the agency has to disclose what it's relying on. That's all I'm saying. I'm not going to pursue this. I made a point, but I just wanted you to consider. Okay. Okay. So I'll finish with that, that here there is enough here for the public to be able to evaluate that concern. So I have one narrow question on commandeering. So does your commandeering argument also apply to the requirement under the security directives to conduct visual inspection? Well, no. We've never raised a commandeering argument because- Does the logic of your commandeering argument cover that too? And if not, why not? No, because I think the costs of essentially ensuring that the access to the physical structure of the airport is only given to people that have badges, to people that are allowed to be there, does not impose the kind of costs and absolutely does not impose the kind of liability that the physical search- What is my comment on commandeering was just about acquiring a state or local entity to carry out a federal sovereign, like a governmental function that just commands the state to do that. Why isn't the same thing happening with the visual inspections? I totally get that the physical screening is a lot more expensive and liability potentially is significantly greater if the obligations are imposed upon the airport operators, but why isn't the imposition of an obligation on airport operators to do the visual inspections also commandeering? Well, first, I don't want to skip over that the liability and cost issues because under Prince and under Murphy, those are fundamental principles under the commandeering provision, right? This idea that the costs are going to be shifted and I think an even more concern here that the blame and the liability will be shifted are fundamental to commandeering. And you think there's no danger of blame shifting or there's no cost associated with visual inspections and making sure that the matter doesn't get back into the security? Whatever cost and liability is associated with that cannot even approach the cost and liability associated with screening workers. Is it enough of a cost and liability that it gives rise to a commandeering challenge? I know that you haven't raised that commandeering challenge and you may think, yes, there's a commandeering challenge, but we just don't care about it enough to raise it, which is a totally coherent- I think because the costs have never approached what we're talking about and the liability in particular, that they've never chosen to raise that challenge. And you think the commandeering challenge is- there wouldn't be a commandeering challenge with respect to this? Well, your point that they're directing the airports to the extent it's impacting the rights of third parties, right? Then there is a commandeering argument, but the way that this impacts the rights of third parties and the way that it raises the liability and cost concerns are, again, as you said, Judge Sperry-Boston, the continental shift that takes this case to a different level, and that's why we're challenging it today. Thank you, counsel. Thank you to both counsel. We'll take this case under submission. Thank you.
judges: Srinivasan; Walker; Rogers